IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 2, 2020

## GREAT AMERICAN INSURANCE COMPANY v. PILOT TRAVEL CENTERS, LLC

**Appeal from the Chancery Court for Knox County**
**No. 181578-2    Clarence E. Pridemore, Jr., Chancellor**

_____

### No. E2019-00649-COA-R3-CV

_____

This appeal arises out of a negligence lawsuit.  TLD Logistics Services, Inc. ("TLD"), an interstate common carrier, sued Pilot Travel Centers, LLC ("Pilot") in the Chancery Court for Knox County ("the Trial Court").  TLD was a customer of Comdata Network, Inc. ("Comdata"), and Pilot was a Comdata vendor.  Upon request from TLD, Comdata issued codes for the creation of Comcheks, negotiable draft instruments TLD used to pay workers.  Pilot would print and deliver the Comcheks.  TLD alleged that Pilot breached its duty of care by failing to ascertain whether Comchek payees were legitimate, thus causing TLD monetary loss when a rogue TLD employee fraudulently caused numerous Comcheks to be issued that were negotiated by Pilot.  Pilot filed a motion for summary judgment.  Pilot argued in its motion that TLD should have kept better internal safeguards to prevent what happened with its employee, and that TLD was 50% or more at fault in this matter.  The Trial Court granted Pilot's motion for summary judgment. Great American Insurance Company ("Great American"), subrogee of TLD and substituted as plaintiff mid-proceedings below, appeals to this Court.  We hold that reasonable minds could disagree as to whether TLD was 50% or more at fault.  We reverse the judgment of the Trial Court, and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Mary Elizabeth Maddox and Matthew A. Grossman, Knoxville, Tennessee, for the appellant, Great American Insurance Company.

Celeste H. Herbert and Cecilia S. Petersen, Knoxville, Tennessee, for the appellee, Pilot Travel Centers, LLC.

## OPINION

## Background

In October 2011, TLD sued Pilot and Knoxville Auto Truck Plaza, Inc. in the Trial Court.[1] TLD alleged that one of its employees, Andrea Trotter ("Trotter"), unilaterally used the company's Comdata account to create codes for the fraudulent issuance of numerous Comcheks payable to individuals and entities other than herself. Trotter presented the Comdata codes to Pilot in order to have these Comcheks printed. TLD alleged it lost over $300,000 as a result of Trotter's scheme. According to TLD, Pilot breached its duty of care by negotiating the Comcheks and paying Trotter when Trotter was not listed on these Comcheks as payee.

In January 2019, Pilot filed a motion for summary judgment raising only comparative fault as the basis for granting summary judgment. Pilot's defense throughout has been that TLD bears the greater share of fault in this matter because its internal safeguards were inadequate. In its statement of material facts, Pilot asserted the following:

> 1. TLD Logistics Services, Inc. ("TLD") was the original Plaintiff in the above-styled case filed October 26, 2011.
> 2. TLD is an interstate common carrier that operates principally via over-the-road trucking[.]
> 3. Comdata Network, Inc., ("Comdata") operates a business that, among other things, provides payment and transaction processing services for common carriers engaged in interstate trucking.
> 4. One of the methods which Comdata provides payment and transaction processing services to common carriers is by facilitating the electronic creation and delivery of negotiable draft instruments ("Comcheks") which may be retrieved from "truck stops" such as those operated by Defendant, Pilot.
> 5. For purposes of the Complaint, Comdata's customers are common carriers like TLD who contract with Comdata to use the Comchek service.
> 6. TLD is a Comdata customer and uses Comdata's Comchek service to send money electronically for the purpose of facilitating its business.

---

[1] Knoxville Auto Truck Plaza, Inc. later was dismissed and is not a party to this appeal.

7. Pilot is a Comdata "vendor" and it prints and delivers Comcheks on behalf of Comdata for the benefit of Comdata's customers.

8. Upon receiving an electronic request from a customer to issue a Comchek, Comdata issues a code that a Comdata vendor, like Pilot, receives to process the transaction and print the Comchek for delivery to the individual presenting the code.

9. Pilot regularly cashes Comcheks it issues after it has received the Comdata code.

10. Andrea Trotter ("Trotter") was an employee of TLD.

11. Trotter, without the knowledge or permission of TLD, accessed TLD's account with Comdata and caused the creation of codes for the issuance of many Comcheks.

12. Trotter, without the knowledge or permission of TLD, presented Comdata codes to Pilot for the printing of Comcheks.

13. During the period of June, 2010, to March, 2011, Pilot printed and cashed 689 Comcheks after receiving a Comdata code from Trotter. The amount of those checks total $368,050.55.

14. As long as the person presenting the code cashed the check, Pilot did not require that the payee of the check match the identification presented when the Comchek was cashed.

15. Jeff Howington ("Howington") was the controller at TLD (or its predecessor) from 2006 to 2011.

16. Howington's password was used for the theft and he was fired by TLD.

17. Howington was never told that the transactions he was authorizing on a daily basis increased dramatically.

18. Melinda Gathers ("Gathers"), the General Manager of TLD, was responsible for reviewing and signing off on the Comdata transactions.

19. With regard to the Comdata transactions, Gathers was supposed to make sure there was back up for each Comdata transaction.

(Record citations omitted). In February 2019, Great American, subrogee of TLD and by then substituted as plaintiff, filed its response. For purposes of summary judgment, Great American did not dispute any of Pilot's material facts. Great American did, however, file a statement of additional material facts. Great American asserted the following as additional material facts precluding summary judgment:

1. The predecessor of TLD was a trucking company shown in the record as being commonly known as "L&D."

2. After the formation of TLD, TLD was constantly growing during the time that Trotter presented and Pilot cashed the Pilot Comcheks (as

such term is defined in the Complaint), from June 30, 2010 through March 30, 2011 (such time period being the "Material Period").

3. During the operation of L&D, that company did not employ the use of "lumpers."

4. Lumpers are independent contractors who unload freight from over-the-road trucks at freights' final destination.

5. After the formation of TLD, TLD began to use lumpers more regularly.

6. Lumpers demand payment by way of Comcheks and similar reliable payments systems.

7. The use of lumpers increased TLD's reliance on Comcheks as a manner of payment and TLD's volume of Comchek transactions increased as a result.

8. TLD's growth during the Material Period caused an increase in the amount of paperwork TLD had to manage from an accounting standpoint.

9. TLD's growth during the Material Period made it more difficult to discover Trotter's fraudulent presentation of, and Pilot's cashing of, the Pilot Comcheks, than would have been the case in the absence of such growth.

10. Trotter obtained codes and cashed Comcheks in store locations TN121A, TN718A, TN741A, TN723A, TN 466A, and TN526 (one transaction only).

11. When Trotter would present Comdata codes at Pilot and when she would use those codes for negotiation and cashing Comcheks, she wore her TLD uniform.

12. Absent special circumstances, at the Material Period, *e.g.*, prior purchase of 25 gallons of fuel, Pilot charges a fee for check-cashing.

13. Pilot charged a fee for cashing substantially all of the Pilot Comcheks (as such term is defined in the Complaint).

14. Each of the Pilot Comcheks identifies Comdata as the drawer and Wells Fargo Bank West, N.A., Comdata's bank, as the drawee.

15. Each of the Pilot Comcheks identifies a specific payee.

16. TLD is neither a drawer nor a drawee of any of the Pilot Comcheks.

17. From TLD's standpoint, a Comchek cannot be TLD's "check," as would be defined by the Uniform Commercial Code, inasmuch as TLD is not a party to the instrument.

18. From Pilot's point of view, the difference between a Comchek and an ordinary check is no more than the difference between American Express and Visa.

19. Pilot has no separate written policies with respect to cashing Comcheks as opposed to any other kind of check, with the exception that Pilot does not cash Western Union checks not printed in the particular Pilot store, and Pilot does not charge check-cashing fees for Western Union checks.

20. Pilot's check-cashing policies with respect to Comcheks are that "the payee is irrelevant."

21. None of the Pilot Comcheks are, on their faces, made payable to cash or are otherwise facially bearer instruments.

22. If Trotter had presented a Pilot clerk with a Comchek printed in that particular Pilot store payable to "Mickey Mouse," it would be consistent with Pilot policy to allow Trotter to endorse that Comchek and negotiate that Comchek for cash in the Pilot store.

23. If Trotter had presented a Pilot clerk with a Comchek printed in that particular Pilot store payable to "Mickey Mouse," it would be consistent with Pilot policy not to require Trotter to present identification showing that she was indeed Mickey Mouse prior to Trotter endorsing that Comchek and negotiating that Comchek for cash in the Pilot store.

24. With respect to TLD's contractual relationship with Comdata, any time that a Comdata code associated with TLD's account with Comdata is presented to a Comdata vendor for the issuance of a Comchek, and the Comchek is printed, TLD is contractually obligated to pay Comdata for the amount of the Comchek, plus a contractually determined service fee.

25. In the event that a Comchek for which TLD would otherwise be obligated to pay Comdata is never negotiated, TLD is entitled to a credit against its account with Comdata in the amount of the unnegotiated Comchek.

26. During the Material Period, Great American Insurance Company was the employee fidelity insurer for TLD and is contractually subrogated to TLD's claims against Pilot with respect to the Comcheks that Trotter forged and that Pilot cashed.

27. But for Pilot's [sic] the negotiation of the Pilot Comcheks as to which Trotter was not payee, Comdata would have credited TLD's account for the amounts of unnegotiated Pilot Comcheks, and neither TLD nor Great American would have suffered any loss as alleged in this action.

(Record citations omitted). In a response, Pilot stated that for purposes of summary judgment it did not dispute these additional material facts. In March 2019, a hearing was held before the Trial Court on Pilot's motion for summary judgment. In April 2019, the Trial Court entered its order ruling in favor of Pilot. The Trial Court quoted Pilot's statement of undisputed material facts but never mentioned Great

American's statement of additional undisputed material facts at all. The Trial Court concluded:

> Having found no genuine issues of material fact to be in dispute, it is the opinion of the Court that reasonable minds could only conclude that TLD's fault was equal to or greater than any alleged fault of Pilot. Therefore, this Court concludes that TLD's fault exceeded 50% and that Plaintiff's case shall be DISMISSED.

Great American timely appealed to this Court.

## Discussion

Although not stated exactly as such, Great American raises the following single issue on appeal: whether the Trial Court erred in granting Pilot's motion for summary judgment. As our Supreme Court has instructed regarding the standard of review on motions for summary judgment:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

> \*\*\*

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is

appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC,* 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

With regard to the elements of negligence, our Supreme Court has explained:

As we have frequently observed, a negligence claim requires a plaintiff to prove the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation. *See, e.g., Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). The duty element is a question

-7-

of law requiring the court to determine "whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Id*. at 870 (quoting W. Page Keeton, *Prosser & Keeton on Torts*, § 37 at 236 (5th ed. 1984)). Appellate review of a question of law is de novo. *Bradshaw*, 854 S.W.2d at 870.

In analyzing duty, the court must balance the foreseeability and gravity of the potential risk of harm to a plaintiff against the burden imposed on the defendant in protecting against that harm. *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 902 (Tenn. 1996). A "risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

*Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998).

Our Supreme Court also has addressed situations where, as here, comparative fault is raised in the context of summary judgment. As explained in *Staples v. CBL & Assocs., Inc.*:

In negligence cases, only after the element of duty is established does the comparative fault of the plaintiff come into play. *See Coln v. City of Savannah*, 966 S.W.2d [34] at 42 [(Tenn. 1998)]. If the defendant has plead the affirmative defense of the plaintiff's relative fault, the reasonableness of the plaintiff's conduct in confronting a risk should be determined under the principles of comparative fault. *See Perez v. McConkey*, 872 S.W.2d 897, 905 (Tenn. 1994). If the evidence is evaluated in the light most favorable to the plaintiff and reasonable minds could not differ that her fault was equal to or great [sic] than that of the defendants, summary judgment in the defendant's favor may be granted. *See Coln v. City of Savannah*, 966 S.W.2d at 44.

*Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 91-92 (Tenn. 2000).

Great American argues that "a determination of comparative fault in this case is properly posed to a fact finder at trial because reasonable minds could differ as to the extent of Pilot's negligence in failing to verify the identity of the individual cashing each Comchek." For its part, Pilot argues that "[r[easonable minds could not differ that TLD was fifty percent or more at fault for the loss incurred as a result of its own employee's

embezzlement." Both parties agree that this is an ordinary negligence case rather than a case implicating the Uniform Commercial Code, and we agree. The sole basis for the Trial Court's granting summary judgment was its determination "that reasonable minds could only conclude that TLD's fault was equal to or greater than any alleged fault of Pilot."

The parties did not dispute each other's material facts for purposes of summary judgment. However, the Trial Court, for some unknown reason, acknowledged only Pilot's statement of material facts. Great American, in its statement of additional material facts, pointed to evidence tending to make the determination of where fault lies in this case less than clear-cut. For instance, Great American stated that "[i]f Trotter had presented a Pilot clerk with a Comchek printed in that particular Pilot store payable to 'Mickey Mouse,' it would be consistent with Pilot policy to allow Trotter to endorse that Comchek and negotiate that Comchek for cash in the Pilot store." Pilot did not dispute this, nor did it dispute any of Great American's additional facts for purposes of summary judgment. In other words, Pilot acknowledges, for purposes of its motion for summary judgment, that its practice was to endorse and negotiate a Comchek no matter how transparently absurd or suspicious the identity of the payee, even if it were Mickey Mouse. Considering all the undisputed material facts—not just Pilot's—at this summary judgment stage, we determine that a reasonable trier of fact could conclude that TLD's fault, if any, was less than 50%. We reach no conclusion as to which party was at fault and by what percentage. We hold only that the question remains amenable to more than one reasonable answer. It was, therefore, reversible error on the Trial Court's part to grant Pilot's motion for summary judgment based solely on its determination that reasonable minds could not differ that TLD's fault was 50% or greater.

Reasonable minds could disagree as to whether TLD was 50% or more at fault. This being so, we reverse the judgment of the Trial Court, and remand for this case to proceed.

## Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for collection of the costs below and for further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellee, Pilot Travel Centers, LLC.

_____
D. MICHAEL SWINEY, CHIEF JUDGE